# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH FRANCISS TOBIN,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>Defendant.<br>_____/ | Case No. 1:17-cv-00229-SKO<br><br>ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT<br><br>(Doc. 1) |

## I. INTRODUCTION

On February 16, 2017, Plaintiff Joseph Franciss Tobin ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") benefits. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///
///

---
[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 5, 6.)

## II. FACTUAL BACKGROUND

On September 27, 2012, Plaintiff protectively filed an application for DIB payments, alleging he became disabled on March 13, 2009, due to hepatitis C, cirrhosis of the liver, high blood pressure, lower back pain, bilateral ankle pain, left hand surgery and pain, shoulder bursitis, and cancer lesions. (Administrative Record ("AR") 33, 92, 106, 184–92, 231.) Plaintiff was born on April 7, 1951, and was 57 years old on the alleged onset date. (AR 51, 92, 186.) He graduated from high school and attended some college. (AR 53.) Plaintiff has past work experience in the produce industry as a broker, facilities manager, field inspector, and buyer. (AR 40, 54–55, 58–61, 244–52.)

### A. Relevant Medical Evidence[2]

#### 1. St. Agnes Medical Center Emergency Department

On March 13, 2009, Plaintiff was involved in a head-on automobile collision, in which he sustained injuries to his head, his neck, his bilateral shoulders, his bilateral thumbs, his low back, his left hand, and his left knee. (AR 291–321, 689.) He was transported to St. Agnes Medical Center, where he was evaluated and treated for a head laceration and hand fracture. (AR 292, 294, 296–97, 689.) An x-ray performed the day of the accident showed a displaced fracture of the third metacarpal on Plaintiff's left hand, as well as degenerative changes of his left wrist and hand. (AR 309.) Plaintiff's lumbar spine x-ray that same day showed mild degenerative changes of the lower lumbar spine with no acute findings. (AR 311.) Plaintiff was given medications and discharged. (AR 295, 297, 300–04, 689.)

#### 2. Regional Hand Surgery Associates Treating Physicians

On March 18, 2009, Plaintiff underwent open reduction and internal fixation of the left third metacarpal by Ricardo Avena, M.D. (AR 557, 572–74.) Plaintiff thereafter developed triggering of the left thumb as well as pain in his right thumb interphalangeal (IP) joint. (AR 549, 557.) An x-ray of Plaintiff's right thumb showed spurring, for which he underwent a steroid injection and was prescribed Celebrex. (AR 549, 557.)

---

[2] As Plaintiff's assertion of error is limited to the ALJ's assessment of the opinion of Michael F. Charles, M.D. regarding Plaintiff's alleged orthopedic impairments (*see* Doc. 12 at 6–11), only evidence relevant to this argument is set forth below.

On September 14, 2009, Dr. Avena informed Plaintiff that his right thumb pain was the result of osteoarthritic disease and could be treated conservatively with steroid injections, nonsteroidal anti-inflammatory medication, and modification of his activities. (AR 549.) He was treated with a second steroid injection. (AR 549.)

Plaintiff was seen by Randi A. Galli, M.D., on November 8, 2010, who explained that his only treatment option for the pain in his right thumb interphalangeal joint, if it was to be treated in the future, was an arthrodesis (surgery to fuse the joint). (AR 547.) Dr. Galli also examined Plaintiff's left thumb, and observed a "positive distraction and shuck test" that was "quite painful." (AR 547.) Dr. Galli noted Plaintiff was "getting by with that thumb in many activities on a daily basis" and discussed with him treatment options consisting of an arthroplasty or arthrodesis. (AR 547.) Dr. Galli explained to Plaintiff that "just like for the right thumb, the left thumb should only undergo surgery once he has more substantial pain occurring on it multiple times on a daily basis." (AR 547.)

### 3. Sierra Pacific Orthopedic & Spine Center Treating Physicians

On March 27, 2009, Plaintiff presented to Malcolm Ghazal, M.D., complaining of shoulder discomfort following his car accident. (AR 664.) On examination, Plaintiff had full active range of motion, strength at 4 to 4+/5 in all planes, with negative Speed test and "guarded" O'Brien and Neer tests. (AR 664.) Dr. Ghazal recommended oral anti-inflammatory medication and referred Plaintiff to physical therapy. (AR 664.)

At his follow up appointment on May 13, 2009, Plaintiff reported improving with physical therapy and home exercise. (AR 665.) Dr. Ghazal examined Plaintiff and noted full range of motion in all planes, with strength at 4/5 in flexion, 4+/5 to abduction, and external rotation at 4+/5. (AR 665.) No palpable tenderness or crepitus was noted. (AR 665.) Dr. Ghazal found Plaintiff had a contusion of the left shoulder and recommended he continue with his home exercise program. (AR 665.)

Plaintiff presented to Dr. Ghazal on November 10, 2010, complaining of pain from sleeping on his side, lifting, carrying, pushing, pulling, or working at above shoulder level, with the right shoulder more symptomatic than the left. (AR 662–63.) On examination, Plaintiff's left

shoulder had "essentially full active and passive range of motion with a mild impingement sign and abduction with forward elevation." (AR 662.) Plaintiff had 4+/5 motor strength and his muscles were "firing well." (AR 662.) Dr. Ghazal found Plaintiff's right shoulder had "approximately 80% or 85% of active and 95 plus percent of passive range of motion with motor strength of 4-/5." (AR 662.) Plaintiff had pain with resisted supraspinatus isolation, a positive Hawkins test, and a "very positive" O'Brien test. (AR 662.) Plaintiff's Speed's test was negative. (AR 662.) Dr. Ghazal assessed Plaintiff with a left shoulder strain "with likely residual subacromial scar tissue" and "an impingement syndrome," and a suspected right shoulder superior labral tear "with biceps pathology and the partial rotator cuff tear or strain associated with impingement in the subacromial space." (AR 662–63.)

In January 2011, Dr. Ghazal noted Plaintiff had full active and passive range of motion with motor strength of a 4/5. (AR 668.) Plaintiff was assessed with ongoing bilateral shoulder pain, particularly on the right side, with residual weakness. (AR 668.) Dr. Ghazal recommended Plaintiff "continue with his usual and customary activities, get back into the gym and exercise as best he can," with a re-check appointment at a physical therapy clinic in six weeks. (AR 668.)

Plaintiff continued to complain of pain in his shoulder at the pectoralis attachment by biceps tendon groove in March 2011. (AR 669.) Dr. Ghazal observed that Plaintiff was likely experiencing "scar tissue irritation or inflammation and trigger point in the anterior shoulder area." (AR 669.) He suggested a corticosteroid injection, which Plaintiff declined. (AR 669, 680.)

On May 11, 2011, Plaintiff presented to Dr. Ghazal complaining of continued interscapular pain, with occasional pain in his left shoulder. (AR 670.) On examination, Plaintiff had "full actively passive range of motion" and motor strength of 5-/5. Dr. Ghazal felt Plaintiff's left shoulder was "doing very well." (AR 670.) Plaintiff's muscles were "firing nicely" and no surgery was indicated. (AR 670.) At Plaintiff's follow up appointment for his left shoulder on November 4, 2011, Plaintiff reported that he felt "much better" and Dr. Ghazal observed that Plaintiff was "doing great" post injury. (AR 817–18.)

On April 23, 2014, Plaintiff complained of right thumb pain that bothered him with gripping and "working out in gripping the bar[,] such as with bench pressing or pinching." (AR

811.) Upon examination, Plaintiff had "point tenderness to the ulnar aspect of the IP joint with prominence of the spurring," a "palpable nodule near the A1 pulley flexor tendon area," "some pain to the thumb CMC joint area," and "some pain with grind test." (AR 812–13.) Plaintiff had good motion at the IP joint and good grip strength. (AR 812–13.) An x-ray performed that day showed "degenerative changes," "hypertrophic spurring," and "[s]ubchondral sclerosis." (AR 813.) Plaintiff was treated with corticosteroid injections that day and again in June 2014. (AR 802, 813.)

Plaintiff was seen by Henry E. Aryan, M.D., on May 1, 2014, for neck pain and "significant bilateral shoulder pain." (AR 807–10.) On examination, Plaintiff exhibited 4/5 weakness in his deltoids and was "[s]ignificant for diminished range of motion in the neck." (AR 809.) Numbness and tingling was also "[s]ignificant." (AR 809.) Dr. Aryan reviewed Plaintiff's radiographic studies and noted "there is spondylosis throughout most of the cervical spine" that it is "worse at C5-C6, and to a less extent at C4-5 and C6-C7." (AR 809.) He discussed with Plaintiff treatment options, including further conservative care, interventional pain management procedures, and surgical intervention, which he did not recommend. (AR 809.) Plaintiff indicated he wished to begin physical therapy "as soon as possible." (AR 809.) Failing that, Dr. Aryan informed Plaintiff the next step would be to "consider injections." (AR 809.)

On May 6, 2015, Dr. Aryan noted that Plaintiff had been undergoing physical therapy since his last visit one year ago, which "seems to be helping." (AR 959. *See also* AR 824.) Dr. Aryan observed Plaintiff's neck pain symptoms were getting "slightly worse, but not markedly worse." (AR 959.) They discussed conservative care, including continuing physical therapy, which Dr. Aryan believed was in Plaintiff's best interest. (AR 960.)

Plaintiff presented to Alexander Majors, M.D., continuing to complain of pain with pinching and grasping at the base of his thumb and intermittent locking of the thumb. (AR 953.) Dr. Majors observed Plaintiff "failed conservative management" and recommended surgical intervention as the best treatment option. (AR 955.) Plaintiff indicated he wished to proceed with the surgery. (AR 955.)

///

### 4. Agreed Medical Examiner Michael F. Charles, M.D.

On March 11, 2010, orthopedist and agreed medical examiner Dr. Charles examined Plaintiff, reviewed his medical record, and issued a "Complex Agreed Medical-Legal Evaluation" dated March 22, 2010.[3] (AR 725–31.) Dr. Charles' examination showed Plaintiff's entire left shoulder girdle/chest "appeared to be chronically swollen" and he had "tenderness of the neck bilaterally, as well as throughout the right shoulder girdle, prominent acromioclavicular joints bilaterally." (AR 728.) Dr. Charles diagnosed Plaintiff with cervical syndrome, chronic pain; left shoulder impingement syndrome, rule out small rotator cuff tear; and diffuse chronic tendinitis. (AR 729.) Plaintiff reported he "could look after himself normally but with extra discomfort." (AR 730.) Dr. Charles opined Plaintiff can lift and carry "light to medium objects when they are conveniently positioned," and that he can walk up to a half a mile. (AR 730.) He found Plaintiff has "some difficulty" climbing a flight of stairs; standing, walking, or sitting for 30 minutes to an hour; and kneeling, bending, and squatting. (AR 730–31.) Plaintiff has "a lot of difficulty" sitting, standing, or walking for two hours; reaching and grasping something off a shelf at eye level; activities that involve pushing and pulling; gripping, grasping, holding, or manipulating objects with his hands; and activities with repetitive motion such as typing on a computer. (AR 730–31.) Dr. Charles further opined Plaintiff is unable to use his arms and hands with forceful activities. (AR 731.)

An x-ray of Plaintiff's right thumb ordered by Dr. Charles was performed March 17, 2010. (AR 706, 733.) It showed "[p]rominent degenerative joint disease at the interphalangeal joint" and "[e]vidence of ligament injury or laxity" at the interphalangeal joint and the "first metacarpal-phalangeal joint." (AR 706.) No acute abnormalities were observed. (AR 706.) An x-ray performed that same day of Plaintiff's left thumb and hand showed "[o]steoarthritic changes of the first carpometacarpal joint of the thumb with degenerative narrowing of the interphalangeal joint," "mild narrowing of the metacarpophalangeal joint of the left thumb where slight subluxation . . . suggesting mild ligamentous injury," and "[m]ild degenerative changes of the phalanges." (AR

---

[3] The parties apparently selected Dr. Charles as an agreed medical examiner in Plaintiff's workers compensation case to resolve disputed medical issues. 8 Cal. Code Regs. § 1(e); Cal. Labor Code §§ 4062.2, 4062.3.

707.) The x-ray showed no acute abnormalities. (AR 707.)

Plaintiff also underwent x-rays of his left and right shoulders on March 17, 2010. (AR 703–04, 733.) The x-rays showed no acute abnormality, but his right shoulder x-ray showed "[m]ild degenerative narrowing of the right glenohumeral joint." (AR 704.) An MRI of Plaintiff's left shoulder performed on March 22, 2010, showed "[g]rossly intact rotator cuff with thinning and scarring of supraspinatus and subscapularis and some loss of subscapularis muscle bulk"; "[m]oderate subacromial-subdeltoid bursitis"; and "[p]atrial detachment of anteroinferior labrum with loss of subjacent anteroinferior glenoid cartilage." (AR 711.)

Dr. Charles also ordered an MRI of Plaintiff's cervical spine, which was performed on March 16, 2010. (AR 708, 732.) "Degenerative bone and disk changes were noted throughout" Plaintiff's cervical spine, with "associated mild to moderate spinal stenosis and moderate bilateral foraminal narrowing throughout." (AR 709.) Degenerative bone and disk changes involving Plaintiff's thoracic spine were also noted. (AR 709.)

On September 19, 2011, Plaintiff was again examined by Dr. Charles, who authored another "Complex Agreed Medical-Legal Evaluation," dated October 5, 2011. (AR 714–24.) Dr. Charles' examination showed Plaintiff's shoulder tests positive on the left for a probable labrum tear, with full range of neck motion. (AR 719.) There was no evidence of sciatic nerve irritation. (AR 719.) Plaintiff had mild tenderness in his low back with no neurovascular deficits of the extremities, and slight decreased sensation in the ulnar distribution of upper extremities bilaterally. (AR 719.) Dr. Charles diagnosed Plaintiff with left shoulder labrum tear; right shoulder chronic bursitis; bilateral carpometacarpal traumatic arthritis; and chronic cervical strain. (AR 720.) Plaintiff reported, in regard to self-care activities of daily living, that he is "uncomfortable to look after himself and [] must be slow and careful." (AR 723.) Dr. Charles opined Plaintiff can only lift and carry "light to medium objects if they are conveniently positioned," and that he can walk up to a half a mile. (AR 723.) He found Plaintiff has "some difficulty" climbing a flight of stairs; and standing, walking, or sitting for 30 minutes to an hour. (AR 723.) Plaintiff has "a lot of difficulty" sitting, standing, or walking for two hours; reaching and grasping activities at shoulder level and above; activities that involve pushing and pulling; and activities that involve repetitive

motion such as typing on a computer. (AR 723.)

Dr. Charles further opined Plaintiff is unable to grip, grasp, hold, or manipulate objects with his hands and to use his arms and hands with forceful activities. (AR 723.) He found that Plaintiff is restricted from work at shoulder level and above on a repetitive basis; from forceful grasping with both hands; and from pushing and pulling. (AR 723.) According to Dr. Charles, Plaintiff is not to perform any "heavy" work with the upper extremities. (AR 723.) He concluded Plaintiff had reached "maximum medical improvement," and noted that while Plaintiff is still considering further treatment, he is "more concerned at this point in time in establishing his own business." (AR 721.)

### 5. Treating Physician Sanjay V. Deshmukh, M.D.

On July 27, 2010, Plaintiff presented to Dr. Deshmukh complaining of neck pain, shoulder pain, bilateral thumb pain, intermittent low back pain, and intermittent left anterior shin pain. (AR 689–97.) As to his neck pain, Plaintiff reported medications give him some relief. (AR 690.) He also stated that change of activity and medications help his low back pain. (AR 690.)

Upon physical examination, Plaintiff had limited range of motion in his neck, shoulders, and dorsolumbar spine. (AR 693.) Dr. Deshmukh observed Plaintiff had tenderness in his paraspinal muscles and his trapezius. (AR 693.) Plaintiff's metacarpophalangeal and carpometacarpal joints in his thumb showed tenderness. (AR 694.) His motor and grip strength were both normal. (AR 694.) Dr. Deshmukh's impression was that Plaintiff had a cervical strain/sprain, bilateral rotator cuff tendinitis, and a bilateral thumb strain/sprain. (AR 695.)

Dr. Deshmukh performed a nerve conduction study and electromyography on March 14, 2011, which ruled out cervical radiculopathy but showed bilateral ulnar neuropathy across Plaintiff's elbow. (AR 681–82.) Plaintiff exhibited restricted range of motion in his cervical and dorsolumbar spine in October 2011. (AR 677.)

### 6. Consultative Examiner Fariba Vesali, M.D.

On March 12, 2013, Plaintiff underwent a comprehensive orthopedic evaluation by Dr. Vesali. (AR 793–96.) Plaintiff complained of "sharp and constant" neck pain and "constant" shoulder pain that is exacerbated by movement. (AR 793.) Plaintiff described his low back pain

as "constant" that "comes and goes," and reported that pain medication decreases the pain. (AR 793.) Plaintiff stated he went underwent physical therapy in the past with temporary improvement of back pain. (AR 793.)

Dr. Vesali observed that Plaintiff was "not in acute distress," and did not have any difficulty getting off and on the examination table, taking off and on his shoes, and picking up a paper clip from the examination table. (AR 794.) Plaintiff walked with a normal gait. (AR 794.) Dr. Vesali noted pain on motion of Plaintiff's cervical and lumbar regions, as well as pain on motion of Plaintiff's bilateral shoulders. (AR 794.) Plaintiff had arthritic nodes in his right thumb interphalangeal joint and tenderness on his bilateral shoulders, metacarpophalangeal and proximal interphalangeal joints on the bilateral first fingers. (AR 795.) Dr. Vesali also noted tenderness on Plaintiff's upper and lower thoracic spine and in his lumbar spine. (AR 795.) Plaintiff had normal motor strength, grip strength, muscle bulk, and muscle tone in his bilateral upper and lower extremities. (AR 795.) His light touch and pinprick sensation in the bilateral upper and lower extremities were normal, and his deep tendon reflexes were 2+ symmetrical in the bilateral upper and lower extremities. (AR 795.) Plaintiff's straight leg raising tests in seated and supine positions were negative bilaterally. (AR 795.)

Dr. Vesali diagnosed Plaintiff with degenerative disc disease in the cervical and lumbar spine, bilateral wrist arthritis, and bilateral thumb arthritis. (AR 795–96.) He opined that Plaintiff should be able to walk, stand and sit for six hours in an eight-hour day with normal breaks; lift and carry 50 pounds occasionally and 25 pounds frequently; perform frequent postural activities; and perform occasional overhead activities with the left hand, but otherwise perform frequent manipulative activities. (AR 796.) Plaintiff did not need an assistive device for ambulation and had no workplace environmental limitations other than working in extremes of cold. (AR 796.)

### 7. State Agency Physicians

On April 5, 2013, C. Bullard, M.D., a Disability Determinations Service medical consultant, assessed Plaintiff's RFC and found Plaintiff could occasionally lift and/or carry 20 pounds and frequently 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform limited push/pull activities with both

extremities; and perform occasional overhead lifting. (AR 100.) Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. (AR 100–101.) Dr. Bullard found Plaintiff's left overhead reaching was limited to occasional, and he could frequently perform handling (gross manipulation) in both hands. (AR 101.) Plaintiff was to avoid concentrated exposure to extreme cold. (AR 101.) Upon reconsideration on October 29, 2013, another Disability Determinations Service medical consultant, M. Acinas, M.D., affirmed Dr. Bullard's RFC findings. (AR 112–15.)

**B. Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on April 10, 2013, and again upon reconsideration on November 5, 2013. (AR 122–25, 127–31.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 133–38.) At the hearing on May 19, 2015, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions. (AR 50–84.)

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a buyer, Dictionary of Operational Titles (DOT) code 162.157-018, which was light exertional work, skilled, with a specific vocational preparation (SVP)[4] of 6, performed at medium; as an agricultural produce commission agent, DOT code 260.357-010, sedentary, skilled, and SVP of 6; and as a wholesaler, DOT code 185.167-070, sedentary, skilled, SVP of 8. (AR 85–86.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work background. (AR 86.) The VE was also to assume this person is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing and/or walking for six to eight hours in an eight-hour workday; climbing ramps and/or stairs, balancing, stooping, kneeling, crouching, and crawling frequently; reaching overhead bilaterally and climbing ropes, ladders, and scaffolds occasionally; and always avoiding concentrated exposure to cold. (AR 86.) The VE testified that such a person could perform Plaintiff's all of past relevant work as performed, except for buyer,

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

which he could perform as generally performed. (AR 86.) The VE testified that Plaintiff could also perform other light, unskilled work such as a fast food worker, DOT code 311.472-010, SVP 2; a cashier, DOT code 211.462-010, SVP 2; and a sales attendant, DOT code 299.677-010, SVP 2. (AR 87.)

The ALJ asked a follow up question regarding a second hypothetical worker who was limited to lifting and carrying no more than 10 pounds both occasionally and frequently; standing and/or walking less than two hours a day; sitting two to six hours a day; handling and fingering occasionally; never reaching overhead bilaterally; performing remaining postural activities occasionally; and always avoiding concentrated exposure to the cold. (AR 88.) The VE testified that there would be no work that such individual could perform, either of Plaintiff's past work or in the national economy. (AR 88.)

Finally, Plaintiff's attorney inquired of the VE whether his answer would change if the ALJ's two hypothetical persons had the additional requirement of working indoors. (AR 88.) The VE testified that that his answer as to hypothetical one would not change and as to the second hypothetical, there would still be no work available. (AR 89.)

**C.      The ALJ's Decision**

In a decision dated November 17, 2015, the ALJ found that Plaintiff was not disabled. (AR 28–40.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 30–40.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of March 13, 2009, through his date last insured of December 31, 2014. (AR 30.) The ALJ found that Plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spine, status post left and right shoulder surgery with bursitis and impingement syndrome of the shoulder, bilateral wrist and thumb arthritis, and liver cirrhosis. (AR 31.) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). (AR 32.) The ALJ determined that Plaintiff had the RFC

> to perform the full range of light work as defined in 20 C.F.R. [§] 404.1567(b). He can occasionally lift and/or carry twenty pounds occasionally and ten pounds frequently. He is able to stand and/or walk six

11

> hours and sit six hours in an eight-hour workday with normal breaks. He would occasionally be able to reach overhead bilaterally. Frequently, he can climb ramps and/or stairs, balance, stoop, kneel, crouch, and crawl and can occasionally climb ropes ladders or scaffolds. He would be able to handle frequently and should avoid concentrated exposure to extreme cold.

(AR 32.)

The ALJ determined that, given his RFC, Plaintiff was able to perform his past relevant work as a buyer and agricultural produce commission agent "as it is generally performed at a light exertional level." (AR 40.) In reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were not entirely credible. (AR 33.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on December 19, 2016. (AR 1–4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

### III.    SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

///

## IV. APPLICABLE LAW

Social security claimants have the initial burden of proving disability. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)–(3).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. § 404.1520(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. § 404.1520(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity (RFC) despite the impairment or various limitations to perform his past work. *Id*. § 404.1520(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. § 404.1520(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett*, 180 F.3d at 1098–99; 20 C.F.R. § 404.1520.

///

## IV. DISCUSSION

Plaintiff contends that the ALJ erred in his treatment of the opinions of Dr. Charles. (*See* Doc. 12 at 6–11.) Defendant counters that that the ALJ properly discounted Dr. Charles' opinions because they conflicted with the medical evidence as a whole.[5] (*See* Doc. 13 at 7–9.)

### A. Legal Standard

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Holohan v. Massanari*, 246 F.3d 1195, 1201–02 (9th Cir. 2001); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally speaking, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining physician's opinion. *Holohan*, 246 F.3d at 1202.

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830–31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)); *see also Lester*, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician

---

[5] The Commissioner also defends the ALJ's decision by suggesting that Dr. Charles' statements are not medical opinions, but instead an account of Plaintiff's stated limitations. (*See* Doc. 13 at 7.) This reason, however, was not asserted by the ALJ in addressing Dr. Charles' opinion. In this regard, this Court may not and will not speculate as to the ALJ's findings or the basis of the ALJ's unexplained conclusions. *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) ("We are constrained to review the reasons the ALJ asserts."); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."); *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) (a reviewing court cannot affirm an ALJ's decision denying benefits on a ground not invoked by the Commissioner).

opinion, *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001)[6], except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

**B.   The ALJ Did Not Commit Harmful Error in His Assessment of the Opinions of Agreed Medical Examiner Dr. Charles.**

Plaintiff was evaluated by Dr. Charles on March 11, 2010, and again on September 19, 2011. (AR 714–31.) His clinical findings included mild tenderness in Plaintiff's low back with no neurovascular deficits of the extremities, slight decreased sensation in the ulnar distribution of upper extremities bilaterally, and his shoulder tests positive on the left for a probable labrum tear, with full range of neck motion. (AR 719.) Dr. Charles diagnosed Plaintiff with left shoulder labrum tear; right shoulder chronic bursitis; bilateral carpometacarpal traumatic arthritis; and chronic cervical strain. (AR 720.) From this, Dr. Charles concluded that Plaintiff can only lift and carry "light to medium objects if they are conveniently positioned," and that he can walk up to a half a mile. (AR 723.) He found Plaintiff has "some difficulty" climbing a flight of stairs; and standing, walking, or sitting for 30 minutes to an hour. (AR 723.) Plaintiff has "a lot of difficulty" sitting, standing, or walking for two hours; reaching and grasping activities at shoulder level and above; activities that involve pushing and pulling; and activities that involve repetitive motion such as typing on a computer. (AR 723.) Dr. Charles further opined Plaintiff is unable to grip, grasp, hold, or manipulate objects with his hands and to use his arms and hands with forceful activities. (AR 723.) He found that Plaintiff is restricted from work at shoulder level and above on a repetitive basis; from forceful grasping with both hands; and from pushing and pulling. (AR 723.) According to Dr. Charles, Plaintiff is not to perform any "heavy" work with the upper extremities. (AR 723.)

---

[6] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

In rejecting Dr. Charles' opinions, the ALJ stated:

> Dr. Charles is not an orthopedic specialist. In fact, he seems to have primarily treated [Plaintiff] for his cirrhosis. I therefore accord his opinions little weight, as they are regarding impairments for which he did not treat [Plaintiff], and are outside his specialty. Moreover, his opinions are outdated and are not entirely consistent with records reviewed at the hearing level.

(AR 39.) The ALJ continued, noting that the "state agency medical consultant and the consultative examiner both opined that [Plaintiff] was less restricted." (AR 39.) Disability Determinations Service medical consultants Drs. Bullard and Acinas, the opinions of whom the ALJ accorded "great weight" (AR 38), both opined Plaintiff could occasionally lift and/or carry 20 pounds and frequently 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; perform limited push/pull activities with both extremities; perform occasional overhead lifting; frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. (AR 100–101, 112–15.) Consultative examiner Dr. Vesali similarly found Plaintiff could walk, stand and sit for six hours in an eight-hour day with normal breaks; lift and carry 50 pounds occasionally and 25 pounds frequently; perform frequent postural activities; and perform occasional overhead activities with the left hand, but otherwise perform frequent manipulative activities. (AR 796.) Having found that Dr. Charles' opinions conflicted with that of Drs. Bullard, Acinas, and Vesali, the ALJ was therefore obliged to provide specific and legitimate reasons for rejecting Dr. Charles' opinions.[7] *Trevizo*, 871 F.3d at 675.

An ALJ may properly discount an examining physician's opinion that is not supported by the medical record. *See Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d

---

[7] Plaintiff criticizes the ALJ for incorrectly classifying Dr. Charles as a treating physician. (*See* Doc. 12 at 7.) Plaintiff's criticism is curious, given that it is more advantageous to Plaintiff that a physician be deemed by the ALJ as a treating—as opposed to an examining—physician, as the former typically carries more weight than the latter. *See Holohan*, 246 F.3d at 1202. Plaintiff's criticism aside, and although Dr. Charles is not a "consultative examiner" retained by Disability Determinations Service, the Court analyzes the ALJ's treatment of Dr. Charles' opinions under the Ninth Circuit's "specific and legitimate reasons" standard of review. *See, e.g., Smith v. Comm'r of Soc. Sec.*, No. 2:16–cv–1561–KJN, 2017 WL 5972737, at *4–5 (E.D. Cal. Dec. 1, 2017).

1016, 1019 (9th Cir. 1992)). Here, the ALJ properly rejected Dr. Charles' assessments of Plaintiff because they were not supported by the objective medical evidence, particularly the examination by Dr. Vesali performed in 2013, after Dr. Charles' assessments.

As the ALJ noted, Dr. Vesali observed Plaintiff was "not in acute distress" and had no difficulty getting off and on the examination table, taking off and on his shoes, and picking up a paper clip from the examination table. (AR 39, 794.) Plaintiff walked with a normal gait. (AR 39, 794.) The ALJ further noted Dr. Vesali's findings that Plaintiff had normal motor strength, grip strength, muscle bulk, and muscle tone in his bilateral upper and lower extremities. (AR 39, 795.) Plaintiff's light touch and pinprick sensation in the bilateral upper and lower extremities were normal and he had normal deep tendon reflexes in the bilateral upper and lower extremities. (AR 39, 795.) As the ALJ observed, Plaintiff's straight leg raising tests in seated and supine positions were negative bilaterally. (AR 39, 795.)

Other medical evidence identified by the ALJ from the time period both before and after Dr. Charles's assessments also fails to support Dr. Charles' opined limitations. As the ALJ noted, a nerve conduction study and electromyography performed in March 2011 ruled out cervical radiculopathy. (AR 681–82.) Plaintiff had "full actively passive range of motion" and motor strength of 5-/5 on examination by Dr. Ghazal in May 2011. (AR 35, 670.) Dr. Ghazal felt Plaintiff's left shoulder was "doing very well," his muscles were "firing nicely," and no surgery was indicated. (AR 35, 670.) The ALJ pointed out that at Plaintiff's follow up appointment for his left shoulder in November 2011, Plaintiff reported that he felt "much better" and Dr. Ghazal observed that Plaintiff was "doing great" post injury. (AR 35, 817–18.)

In April 2014, Plaintiff complained of right thumb pain but had good motion at the interphalangeal joint and good grip strength in his right thumb, and, as the ALJ observed, he was treated with corticosteroid injections. (AR 36, 812–13.) With respect to Plaintiff's shoulder pain, in May 2014 Dr. Aryan recommended against surgery and encouraged further conservative care, including physical therapy. (AR 36, 809.) The ALJ pointed out that Plaintiff underwent physical therapy in 2014 and 2015, which Dr. Aryan observed was in Plaintiff's best interest and "seem[ed] to be helping." (AR 35–36, 824, 959–60.) Finally, although they do not and cannot "by

1 [themselves] constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," *Revels v. Berryhill*, 874 F.3d 648, 664 (9th Cir. 2017) (quoting *Lester*, 81 F.3d at 831), the state physicians' opinions, relying on the more recent medical evidence than that relied upon by Dr. Charles, also fail to support Dr. Charles' opined limitations. (*See* AR 38–39.)

In sum, the ALJ identified ample medical evidence in the record that undermines Dr. Charles' opinions that Plaintiff is unable to grip, grasp, hold, or manipulate objects with his hands or use his arms and hands with forceful activities, and that Plaintiff has "a lot of difficulty" sitting, standing, or walking for two hours, reaching and grasping activities at shoulder level and above, performing activities that involve pushing and pulling, and performing activities that involve repetitive motion such as typing on a computer. This is a specific, legitimate reason supported by substantial evidence for discounting the opinions of Dr. Charles.[8] *See Magallanes*, 881 F.2d at 751; *see also Bayliss v. Barhart,* 427 F.3d 1211, 1216 (9th Cir. 2005); *Batson*, 359 F.3d at 1195. As the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner, it will therefore not disturb the ALJ's finding on this basis, even if, as Plaintiff points out (*see* Doc. 12 at 9–10), some of the above-described evidence could be construed more favorably to him.[9] *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *Thomas*, 278 F.3d at 954 (Where the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld.); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.").

///

---

[8] The Court's affirmance of the ALJ's finding that Dr. Charles' opinions were not supported by the medical record applies with equal force to Plaintiff's suggestion that the opinions gave rise to a closed period of disability from Plaintiff's alleged onset date of March 13, 2009, through October 5, 2011, the date of Dr. Charles' last report. (*See* Doc. 12 at 10.)

[9] Plaintiff further contends (Doc. 12 at 8), and the Commissioner agrees (Doc. 13 at 7), that the ALJ confused Dr. Charles with Charles M. Farr, M.D., who treated Plaintiff for liver cirrhosis. In so doing, the ALJ incorrectly stated that Dr. Charles' opinions regarded "impairments for which he did not treat [Plaintiff], and are outside his specialty" because he "is not an orthopedic specialist." (AR 39.) While it is true that the ALJ erred in this regard, such error is harmless because the ALJ articulated another, permissible reason for discounting Dr. Charles' opinion, *see* Section IV.B, *supra*. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

**V.     CONCLUSION AND ORDER**

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **April 16, 2018**               /s/ *Sheila K. Oberto*
                                    UNITED STATES MAGISTRATE JUDGE